ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| AUTORIDAD DE TIERRAS DE PUERTO RICO<br><br>Apelante<br><br>v.<br><br>COMUNIDAD AGRÍCOLA BIANCHI, INC. Y OTROS<br><br>Apelados | KLAN202300721 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Caso Núm.: K EF2004-0746<br><br>Sobre: Expropiación Forzosa |

Panel integrado por su presidenta, la Juez Brignoni Mártir, la Jueza Álvarez Esnard, la Jueza Díaz Rivera y el Juez Campos Pérez[1]

Campos Pérez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de junio de 2024.

Comparece la parte peticionaria y apelante, Autoridad de Tierras de Puerto Rico (Autoridad de Tierras). Solicita la revocación de la *Sentencia* emitida el 5 de julio de 2023, notificada el día 17 siguiente, por el Tribunal de Primera Instancia (TPI).[2] En el referido dictamen, el TPI declaró con lugar la *Petición de Expropiación Forzosa* instada por la Autoridad de Tierras. En consecuencia, como justa compensación, ordenó satisfacer la suma total de $9,257,770.40 a favor de la parte peticionada y apelada, la Comunidad Agrícola Bianchi, Inc. (CAB).

Anticipamos la confirmación del dictamen apelado. Reseñamos, a continuación, los hechos procesales relevantes.

**I.**

La causa de autos se inició el 9 de julio de 2004, ocasión en que la Autoridad de Tierras instó una *Petición de Expropiación*

---

[1] El Hon. José I. Campos Pérez sustituyó al Hon. Carlos I. Candelaria Rosa, por virtud de la Orden Administrativa TA-2023-212, emitida el 6 de diciembre de 2023.
[2] Apéndice de la parte apelada, págs. 1-22.

Número Identificador

SEN2024_____

*Forzosa.*[3] Solicitó la adquisición en pleno dominio de tres predios de terreno —a ser segregados de la finca número 1302, inscrita al folio 231 del tomo 219 de Aguada, del Registro de la Propiedad, Sección de Aguadilla (Catastro 069-000-007-31 Procedencia)— sitos en Aguada, Aguadilla y Moca, pertenecientes a la CAB.[4] El fin público era llevar a cabo el proyecto "Reserva Agrícola Valle del Coloso" (finca Coloso). La Autoridad de Tierras estimó el justo valor del inmueble en $5,770,000.00 y consignó dicha cuantía en el TPI.

Luego de observar los procedimientos de rigor, innecesarios de pormenorizar, el TPI celebró el juicio en su fondo el 29 de marzo de 2022, con el propósito de determinar el justo valor en el mercado de la finca Coloso. Por la parte peticionaria, en calidad de perita, declaró la Sra. Agnes Muñoz Guardiola (señora Muñoz Guardiola); y por la parte peticionada, prestó testimonio el perito Ing. Pedro Pons Mier (ingeniero Pons Mier).

Evaluada la prueba documental y testifical, en atención a los señalamientos de error planteados, el TPI consignó las siguientes determinaciones de hechos:

> 1. La cabida del sujeto arroja un área de 2,314.4426 cuerdas.
>
> 2. El mejor uso del sujeto es agrícola; conservación de recursos.
>
> .        .        .        .        .        .        .        .
>
> 5. La Ley 142 del 4 de agosto de 2000,[5] declaró Reserva Agrícola los terrenos incluidos en la Petición, pero esta ley no afecta en su totalidad las fincas propiedad de CAB, Inc.

---

[3] Apéndice del recurso, págs. 23-37. Es meritorio señalar que el 21 de septiembre de 1972, los litigantes suscribieron un contrato de arrendamiento sobre la propiedad en cuestión, conocida como el Valle del Coloso, para la producción agrícola de caña. El contrato, que fue renovado varias veces, expiró el 17 de junio de 1999. No obstante, la Autoridad continuó con la posesión de los predios y el pago de los cánones de arrendamiento. El 10 de febrero de 2003, la CAB dejó de aceptar los pagos, reclamó como vencido el arrendamiento y demandó a la Autoridad de Tierras por expropiación a la inversa, incumplimiento de contrato, cobro de dinero, daños y perjuicios (Caso Núm. KAC03-0863). Véase, *Sentencia* de 16 de diciembre de 2005, KLAN200401284. Pendiente el litigio, la Autoridad de Tierras incoó el pleito del título.

[4] Véase, Apéndice del recurso, págs. 118-134.

[5] *Ley de la Reserva Agrícola del Valle del Coloso*, 5 LPRA secs. 1731-1737.

6. Las tres (3) fincas de la parte con interés que fueron objeto de expropiación en el presente caso son colindantes entre sí.

7. Durante más de 30 años antes de la radicación del caso de epígrafe, la Corporación Azucarera de Puerto Rico y, posteriormente, la Autoridad de Tierras de Puerto Rico, ocuparon en calidad de arrendatarios las fincas que luego fueron expropiadas.

.    .    .    .    .    .    .    .

21. Una porción del sujeto está zonificada como distrito agrícola AR-1 y AR-2, otra como conservación de recursos y otra como desarrollo selectivo y área desarrollada.

22. El sujeto tiene un sesenta por ciento (60%) en zona inundable de acuerdo con los planos de inundabilidad de FEMA.

23. El sujeto tiene aproximadamente un diez por ciento (10%) de su área en humedales, conforme se identifica en el plano de mensura.

24. Pons Mier tasó el sujeto (una parcela vacante agrícola sin estructuras) aplicando el principio del *unit rule*.

25. Al tratarse de una finca agrícola, la forma correcta de tasar el sujeto era bajo el *unit rule* o como un solo ente, que es la regla federal para todas las fincas agrícolas.

.    .    .    .    .    .    .    .

29. Las ventas que utilizó Pons Mier las buscó bajo el *unit rule* porque no es posible conseguir ventas en las que le puedan especificar precios distintos por sus fragmentos conforme a sus características (ejemplo: del total de mil cuerdas, se pagó una cantidad por las cuerdas que estaban en humedales, otra por las que estaban sembradas de caña y otra por las partes que no tienen posible desarrollo). El comprador da un precio unitario completo sin detallar un valor distinto para cada área.

30. Pons Mier utilizó cuatro ventas comparables: venta 1, con 490.7379 cuerdas, en Lajas; venta 2, con 1,034.1712 cuerdas, en Ponce; venta 3, con 4,959.34 cuerdas, en Yabucoa; y, la venta 4, con 430.683 cuerdas, en Lajas.

31. Las primeras tres ventas comparables utilizadas por Pons Mier son las tres ventas que utilizó Muñoz Guardiola.

32. El valor ajustado de las ventas comparables evaluadas por Pons Mier fluctuó entre $3,230.00 por cuerda en la venta 2 (con el valor menor) y $6,612.00 por cuerda en la venta 4 (con el valor mayor).

33. El valor ajustado de las ventas comparables evaluadas por Muñoz Guardiola fluctuó entre $1,300.00 por cuerda en la venta 1 (con el valor menor) y $3,500.00 en la venta 3 (con el valor mayor).

. . . . . . . .

48. Aunque el sujeto tiene un área en cauce mayor del río Culebrinas, éste no afecta una parte mayor de la finca, sino lo que se considera como normal con una crecida de un río, según se refleja en los mapas de FEMA.

. . . . . . . .

58. La venta 3 se efectuó el 3 de julio de 2003 y el precio de venta fue de $18,845,454.00, con un valor unitario de 3,800.00 por cuerda.

59. La venta 3 es una finca en Yabucoa de 4,959.34 cuerdas, en la que el vendedor fue la East Porto Rico Sugar and Desarrollos Agrícolas del Este, SE, representados por el señor Agustín Cabrer. El comprador fue la Autoridad de Tierras de Puerto Rico.

60. La venta 3 tiene una configuración irregular y es más bien llana, bordeando la vieja central de caña y el batey, igual que el sujeto.

61. Pons Mier habló con el señor William Navas, representante de Desarrollos Agrícolas del Este, el 25 de enero de 2018, y este le informó que la finca tenía unas 3,000 cuerdas inundables, lo que representa un sesenta por ciento (60%) de su cabida.

62. Al momento de la venta 3, la finca no estaba zonificada, sin embargo, su mejor uso era agrícola y nunca se consideró otro mejor uso para ella. Por tanto, no procede hacer un ajuste por zonificación.

63. La Autoridad de Tierras adquirió la venta 3 en el 2003 por $18,845,454.00. Posteriormente, en el 2009, estableció allí la Reserva Agrícola del Valle de Yabucoa. Las zonificaciones de esta reserva son casi idénticas a las del sujeto.

64. El único ajuste cuantitativo que procede realizar a la venta 3 es el de tiempo o condiciones de mercado por $249.00 por cuerda, por el año de diferencia entre esta venta y la fecha a la que se tasó el sujeto. Esta cantidad proviene del 6.56% anual, computado utilizando el método de venta pareada desarrollado con la reventa de la venta 2.

65. La venta 3 es la venta más similar en cuanto a la inundabilidad.

66. La venta 3 es la más similar al sujeto y su valor ajustado por cuerda es de [$4,049.00] por cuerda.

67. Pons Mier concluyó correctamente un valor redondeado de $4,000.00 por cuerda para el sujeto basado en la venta 3, por ser esta la más similar al

sujeto en todos sus elementos, excepto en la fecha de la venta.

68. Por tanto, el valor del sujeto, con una cabida de 2,314.4426 cuerdas, es de $9,257,770.40.

Al tenor de los hechos probados, el TPI decretó la titularidad y el pleno dominio de la Autoridad de Tierras sobre la finca Coloso. Como justa compensación, justipreció la suma de $9,257,770.04 ($4,000.00 x 2,314.4426 cuerdas). De esta cuantía, $5,770,000.00 habían sido consignados por la Autoridad de Tierras, por lo que el pago de intereses se impuso sobre la diferencia: $3,487,770.40.

Inconforme con la decisión judicial, el 15 de agosto de 2023, la Autoridad de Tierras acudió ante nos y señaló la comisión de los siguientes errores:

> ERR[Ó] EL TRIBUNAL DE PRIMERA INSTANCIA AL NO DAR PESO Y VALOR A LA DIFERENCIA DE ZONIFICACI[Ó]N ENTRE EL SUJETO Y LA VENTA A LA CUAL DETERMIN[Ó] SER M[Á]S PARECIDA AL SUJETO (VENTA N[Ú]MERO 3).

> ERR[Ó] EL TRIBUNAL DE PRIMERA INSTANCIA AL CONCEDER UN AJUSTE DESPROPORCIONAL POR TIEMPO O AUMENTO DE VALOR POR LA DIFERENCIA EN TIEMPO TRANSCURRIDO ENTRE LA VENTA N[Ú]MERO 3 Y LA RADICACI[Ó]N DE LA PETICI[Ó]N DE EXPROPIACI[Ó]N.

CAB presentó su alegato el 6 de septiembre de 2023. Con el beneficio de su comparecencia, el *Informe de Valorización*, presentado por la señora Muñoz Guardiola,[6] el *Informe de Valorización*, suscrito por el ingeniero Pons Mier,[7] y la transcripción de la prueba oral, estamos en posición de resolver.

## II.

## A.

El Art. II, Sec. 9 de nuestra Constitución establece que "[n]o se tomará o perjudicará la propiedad privada para uso público a no ser mediante el pago de una justa compensación y de acuerdo con

---

[6] Apéndice del recurso, págs. 38-170.
[7] Apéndice de la parte apelada, págs. 23-74.

la forma provista por ley". Const. E.L.A., Art. II, sec. 9, 1 LPRA. Asimismo, nuestra Carta Magna instituye el derecho a que ninguna persona sea privada de su propiedad sin el debido proceso de ley. Const. E.L.A., Art. II, sec. 7. Ahora, como es sabido, el derecho de expropiación del Estado es un atributo inherente y necesario de la soberanía y es superior a todos los derechos de propiedad. *A.C.T. v. 780.6141m²*, 165 DPR 121, 130 (2005) y la jurisprudencia allí citada. Por expropiación forzosa, se entiende "el poder soberano que reside en el Estado para adquirir el dominio de una propiedad sita dentro de sus límites territoriales". *ELA v. El Ojo de Agua Development*, 205 DPR 502, 518 (2020).

Así, pues, una vez se presenta la declaración de adquisición y se consigna el importe estimado como justa compensación, el gobierno es investido del título sobre la propiedad. *A.C.T. v. 780.6141m²*, *supra*, pág. 131. Claro está, esta facultad está sujeta también a que el objeto expropiado sea para un fin público y que se siga el procedimiento establecido por ley. *Id.*, pág. 130; *Culebra Enterprises Corp. v. E.L.A.*, 143 DPR 935, 946 (1997). En general, el procedimiento de expropiación forzosa es de naturaleza civil y debe llevarse a cabo de conformidad con la Ley de 12 de marzo de 1903, según enmendada, conocida como la *Ley General de Expropiación Forzosa*, 32 LPRA secs. 2901-2913, y la Regla 58 de Procedimiento Civil, *Expropiación Forzosa de Propiedad*, 32 LPRA Ap. V, R. 58; *ELA v. El Ojo de Agua Development*, *supra*, pág. 519.

Como contraparte de este poder constitucional, existe también la acción de expropiación a la inversa para remediar aquellos casos de ocupación física, sin una consignación previa de justa compensación. Por ello, la obligación de pagar una compensación justa también cobra vigencia cuando el Estado realiza una incautación de hecho. *Culebra Enterprises Corp. v. E.L.A.*, *supra*, págs. 946-947. Ante estas situaciones, la compensación

comprenderá el valor de uso de la propiedad durante el tiempo en que el Estado privó al dueño de todo uso productivo de ella. *Id.*, pág. 947.

Por otro lado, el titular del bien expropiado puede impugnar el fin público alegado, así como la cuantía de compensación. En particular, a través de la justa compensación, se procura "[...] colocar al dueño de la propiedad en una situación económica equivalente a la que se encontraba con anterioridad a la expropiación de su propiedad". De ordinario, "[l]a justa compensación a que tiene derecho el dueño de un bien expropiado es aquella cantidad que representa todo el valor de la propiedad al tiempo de la incautación". *E.L.A. v. Fonalledas Córdova*, 84 DPR 573, 579 (1962), citado con aprobación en *ELA v. El Ojo de Agua Development, supra*, pág. 519. Además, el Tribunal Supremo ha reconocido que el propietario puede reclamar la compensación por los daños que, por motivo de la expropiación, le fueron ocasionados al remanente de su propiedad. *Id.* El alto foro ha resuelto que, cuando el dueño del inmueble expropiado no está conforme con la compensación ofrecida por el Estado, el peso de la prueba se invierte, y es éste, entonces, quien tiene que demostrar su derecho a obtener una suma mayor, asumiendo el rol de parte demandante. *ELA v. El Ojo de Agua Development, supra*, págs. 520-521.

Adjudicada una suma mayor al dueño del bien expropiado, corresponderá el pago de intereses como parte integral de la justa compensación a concederse. *Id.*, pág. 521. Es decir, "la diferencia entre la cantidad que se determine finalmente como justa compensación en una expropiación y la que consignó inicialmente el Estado, hay que [sumarle] los intereses", según establecidos por la Oficina del Comisionado de Instituciones Financieras. *Id.*, pág. 521, que cita a *E.L.A. v. Rexco Industries*, Inc., 137 DPR 683, 690 (1994); véase, además, Sección 5(a) de la Ley de Expropiación

Forzosa, 32 LPRA sec. 2907 5(a).

**B.**

El Tribunal Supremo de Puerto Rico ha enfatizado la deferencia que los foros apelativos debemos conferir a la apreciación de la prueba testifical que realiza el juzgador o la juzgadora de hechos. *McConnell Jiménez v. Palau*, 161 DPR 734, 750 (2004); *Argüello v. Argüello*, 155 DPR 62, 78-79 (2001); *López Vicil v. ITT Intermedia Inc.*, 142 DPR 857, 864 (1997). En ese sentido, el alto foro ha enunciado que "la tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz". *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013), reiterado en *Gómez Márquez et al. v. El Oriental*, 203 DPR 783, 792 (2020). En atención a esto, como regla general, los tribunales apelativos no debemos intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que haya efectuado el tribunal sentenciador. Tampoco ostentamos facultad para sustituir las determinaciones del foro de primera instancia por nuestras propias apreciaciones. *Gómez Márquez et al. v. El Oriental, supra,* pág. 793; *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2005). Sin embargo, prevalece un examen distinto cuando el testigo comparece en calidad de perito.

**C.**

La Regla 702 de Evidencia, 32 LPRA Ap. VI, R. 702, regula el testimonio pericial. Reza la norma, en su parte pertinente:

> Cuando conocimiento científico, técnico o especializado sea de ayuda para la juzgadora o el juzgador poder entender la prueba o determinar un hecho en controversia, una persona testigo capacitada como perita —conforme a la Regla 703— podrá testificar en forma de opiniones o de otra manera. [...]

En nuestro ordenamiento jurídico, rige una norma liberal, en cuanto a la capacidad de un testigo para declarar, pero no necesariamente para cualificarse como perito. A esos fines, la Regla 703 de Evidencia, 32 LPRA Ap. VI, R. 703, establece los criterios para la calificación de la persona perita, a saber: "su especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para calificarla como experta o perita en el asunto sobre el cual habrá de prestar testimonio". A través de su educación o experiencia, el perito ha desarrollado un conocimiento o destreza sobre una materia, por lo cual puede formar una opinión que sirva de ayuda al juzgador de hechos. *S.L.G. Font Bardón v. Mini-Warehouse*, 179 DPR 322, 338 (2010). Por tanto, una persona puede cualificarse como perito por los conocimientos especializados que posee, ya sean producto de su experiencia o de su educación. *Dye–Tex P.R., Inc. v. Royal Ins. Co. P.R.*, 150 DPR 658. 663 (2000).

Los tribunales tienen amplia discreción al apreciar la prueba pericial. Igualmente, los foros revisores nos encontramos en la misma posición de los foros primarios en cuanto a la evaluación de determinaciones de hechos fundamentadas en la prueba pericial. En tales situaciones, podemos adoptar nuestro propio criterio en la apreciación o evaluación de la evidencia pericial o incluso descartarla, aunque resulte técnicamente correcta. *Díaz v. Pneumatics & Hydraulics*, 169 DPR 273, 297 (2006); *Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R., supra*, págs. 662-663 y los casos allí citados.

El valor probatorio del testimonio pericial dependerá de varios factores, a saber: (1) si el testimonio está basado en hechos o información suficiente; (2) si el testimonio es producto de principios y métodos confiables; (3) si la persona aplicó los principios y métodos de manera confiable a los hechos del caso; (4) si el principio subyacente al testimonio ha sido aceptado generalmente en la

comunidad científica; (5) las calificaciones o credenciales de la persona testigo, y (6) la parcialidad de la persona testigo. Regla 702 de Evidencia, *supra*. Estos criterios no constituyen una lista taxativa, toda vez que, para conferir valor probatorio al testimonio pericial, lo esencial es su confiabilidad. "Existen otros factores que muy bien pudieran afectar el valor probatorio del testimonio pericial". *Informe de las reglas de derecho probatorio*, Tribunal Supremo de Puerto Rico, Secretariado de la Conferencia Judicial y Notarial, marzo de 2007, pág. 424. En armonía, el alto foro ha enunciado que "[e]l juez tiene una amplia discreción con relación a la admisión o exclusión de la prueba pericial. Sus determinaciones deben ser sostenidas a menos que sean claramente erróneas". *S.L.G. Font Bardón v. Mini-Warehouse, supra*, pág. 343.

Dentro del marco jurídico antes enunciado, procedamos a discutir a continuación los señalamientos de error esbozados.

## III.

### (i)

La Autoridad de Tierras alega en el primer señalamiento de error que el TPI incidió al no dar peso al hecho que la finca de la venta comparable más parecida, la venta número tres, no estaba zonificada al tiempo de su adquisición. Arguye que la falta de zonificación implica que no existían limitaciones legales para su uso, siempre que se obtuvieran los correspondientes endosos y permisos.

De entrada, la apelante no impugnó el uso de la venta número tres como comparable para valorizar la justa compensación por la expropiación forzosa de la finca Coloso, por lo que nos suscribimos a la misma. La finca comparable de la venta número tres se refiere a la que, en antaño, se conoció como la Central Roig en Yabucoa (finca de Yabucoa), que se dedicaba a la producción de la caña. Surge del expediente que revisamos que, el 3 de julio de 2003, la Autoridad de Tierras compró la propiedad de 4,959.34 cuerdas por

$18,845,454.00; esto es, un valor unitario de $3,800.00 por cuerda.[8] La finca de Yabucoa es llana con porciones ondulantes, tiene una configuración irregular y secciones inundables (3,000 cuerdas o 60% de su cabida). **Su mejor uso es el agrícola**.[9]

Cónsono con lo anterior, es meritorio señalar que la Ley Núm. 49 de 3 de agosto de 2009, *Ley de la Reserva Agrícola del Valle de Yabucoa*, 5 LPRA secs. 1911-1917, entre otros pronunciamientos, ordenó la adopción de una **resolución de zonificación especial** para estimular la producción y el **desarrollo agrícola** de la región del Valle de Yabucoa. Además, **prohibió la aprobación de consultas de ubicación, la otorgación de permisos de construcción o de uso**, en contravención a la política pública promulgada en el estatuto.[10]

Si bien la legislación es posterior a la adquisición de la finca de Yabucoa, estimamos que la presunta omisión de dar valor a la

---

[8] Se le cuestionó a la señora Muñoz Guardiola sobre esta valorización:

P. Bien. Pasemos a la venta número tres, doña Agnes. ¿Cuánto tiempo usted lleva trabajando para [la] Autoridad de Tierras?
R. Casi 30 años.
P. ¿Tuvo usted la encomienda de tasar la finca de Yabucoa, la que usted identifica como venta comparable número tres, usted intervino en la valoración de esa finca...
R. No hubo valoración.
P. ...cuando se fue a adquirir, cuando se fue a comprar?
R. No hubo valoración.
P. ¿No hubo valoración? ¿Y c[ó]mo la Autoridad pagó $18,000,000 por una finca sin tener un Informe de Valoración?
R. Desconozco, ahí yo no entro en esos parámetros.

Transcripción de la Prueba Oral (TPO), págs. 113 líneas 20-25; 114 líneas 1-10.
[9] TPO, pág. 50 líneas 20-24; 51. Apéndice del recurso, págs. 87-89; 204.
[10] El Artículo 1 de la Ley Núm. 49-2009, *Declaración de Política Pública*, 5 LPRA sec. 1911, establece, en parte:

El Gobierno del Estado Libre Asociado de Puerto Rico, ha reconocido que la agricultura constituye un sector de suma importancia en nuestro desarrollo socioeconómico, donde miles de familias dependen de esta actividad para mejorar su calidad de vida. En adición a su valor económico, la agricultura representa el modo de vida de muchas generaciones de puertorriqueños. Por estas y muchas otras razones, el sector agrícola es considerado una actividad necesaria para producir alimentos, conservar el ambiente, generar empleos, y en fin, mantener activa nuestra economía.

.        .        .        .        .        .        .        .

La Asamblea Legislativa y el Gobierno de Puerto Rico, reconocen que los terrenos comprendidos en el Valle de Yabucoa son sumamente valiosos para el uso agrícola por su localización, topografía, características físicas, fertilidad de sus suelos y características hidrogeológicas. A los fines de continuar con el desarrollo agrícola en la Región Sureste de la Isla, consideramos, para los mejores intereses del pueblo de Yabucoa y por ende de Puerto Rico en general, declarar al Valle de Yabucoa como una reserva agrícola.

falta de zonificación es inmaterial, toda vez que la Autoridad de Tierras la compró para la conservación de recursos. De hecho, en su *Informe de Valorización*, la señora Muñoz Guardiola expresó que el mejor uso de la comparable era el agrícola, al que históricamente se dedicó.[11] Así se desprende también, por ejemplo, de las expresiones de la Asamblea Legislativa en la *Exposición de Motivos* de la Ley Núm. 49-2009: "En el interior del Valle ubica la antigua Central Roig y cuyos terrenos (conocidos como la Finca Batey Central Roig) pertenecen a la Autoridad de Tierras de Puerto Rico. [...] **La Autoridad adquirió unas cinco mil (5,000) cuerdas**, a través de compra a la Sucesión Roig, que componen prácticamente la totalidad de las tierras en la periferia de la Central, **con la finalidad de utilizarlas para propósitos agrícolas**". (Énfasis nuestro). Al igual que la perita de la Autoridad de Tierras, el ingeniero Pons Mier coincidió con el mejor uso agrícola de la finca de Yabucoa.[12]

En lo que atañe a la finca Coloso en este caso, la Ley Núm. 142 de 4 de agosto de 2000, *Ley de la Reserva Agrícola del Valle del Coloso*, 5 LPRA secs. 1731-1737, previo a la petición del epígrafe, también había ordenado la adopción de una **resolución de zonificación especial** para estimular la **producción y desarrollo agrícola**. Asimismo, **prohibió la aprobación de consultas de ubicación, la otorgación de permisos de construcción o de uso** en contravención con la política pública.[13] Por consiguiente,

---

[11] Apéndice del recurso, pág. 87.

[12] Apéndice del recurso, pág. 204.

[13] El Artículo 1 de la Ley Núm. 142-2000, *Declaración de Política Pública*, 5 LPRA sec. 1731, estatuye:

El Gobierno de Puerto Rico, reconoce la agricultura como una actividad de vital e imperiosa importancia para el bienestar económico del país y declara como política pública la reservación de los terrenos comprendidos dentro del Valle el Coloso como reserva agrícola. La Asamblea Legislativa de Puerto Rico reconoce que los terrenos que componen el Valle del Coloso, en posesión de características físicas, topográficas y geológicas idóneas para la agricultura y ecoturismo deben destinarse para uso exclusivo de la producción agrícola y, desarrollo ecoturístico en consecuencia de ello, declara esta zona como reserva agrícola del país asegurando, además, el fortalecimiento de la zona de noroeste de la Isla.

actualmente, en ambos predios, es innegable que convergen zonificaciones protectoras sustancialmente similares.

Sobre este particular, reproducimos el testimonio pericial que tuvo ante sí el TPI:

### Ing. Pedro Pons Mier

El ingeniero mecánico Pedro Pons Mier ha fungido como tasador de bienes raíces durante 50 años.[14] Sus cualificaciones fueron debidamente estipuladas, según surge de las determinaciones de hechos 9-16 de la *Sentencia.*[15]

En cuanto a la zonificación, el perito Pons Mier indicó que "[e]n Puerto Rico no todas las zonas están zonificadas...".[16] Ahora, acerca este caso, dijo: "Estamos hablando de una finca que tradicionalmente era uso agrícola, que su mejor uso sigue siendo agrícola y **la adquiere la Autoridad por el gran potencial de uso agrícola**...".[17] (Énfasis nuestro). Añadió:

> Y no significa gran cosa [que no esté zonificada], en realidad no significa, porque la finca, **por su topografía, por su uso tradicional, su mejor uso sigue siendo agrícola, o sea, no tiene otro uso, no se va a desarrollar de otra forma**.
>
> · · · · · · · ·
>
> [C]uando una finca es de mejor uso agrícola, la zonificación de **la reserva viene a ser una protección para que se mantenga en ese uso**.[18] (Énfasis nuestro).

Con relación al uso del predio, el perito reiteró que el mejor uso es el que tradicionalmente ha tenido: el agrícola.[19]

### Sra. Agnes Muñoz Guardiola

La perita de la Autoridad de Tierras, quien trabaja en la agencia hace 30 años, ostenta un bachillerato en comunicaciones y se licenció en 1997 como evaluadora de bienes raíces.[20] Durante 23

---

[14] TPO, pág. 20 líneas 7-24.
[15] Véase, TPO, págs. 20-26.
[16] TPO, pág. 66 líneas 5-6.
[17] TPO, pág. 66 líneas 6-10.
[18] TPO, págs. 67 líneas 13-16; 68 líneas 21-24.
[19] TPO, pág. 35 líneas 23-25.
[20] TPO, págs. 85 líneas 15-22; 86 líneas 18-20.

años ha laborado como evaluadora profesional y gerente de tasaciones en la agencia. Aun cuando sus calificaciones no fueron estipuladas, éstas fueron consignadas en las determinaciones de hechos 18-20 del TPI.[21].

Al abordar el tema de la zonificación, la señora Muñoz Guardiola declaró:

> P. [...] [E]l área que usted reporta como comparable, dice que está, que es superior en zonificación. Sin embargo, la finca está fuera del área zonificada, ¿correcto?
>
> R. Sí.
>
> P. Sí. Bien. ¿Y los terrenos agrícolas son terrenos agrícolas?
>
> R. Unjú.
>
> P. ¿Hay una categoría que podríamos decir "Esta finca es agrícola, pero esta es superagrícola" o "Es agrícola"?
>
> R. "Es agrícola".[22]

En la causa de autos, en 2003, la Autoridad de Tierras acordó pagar $3,800.00 por cada cuerda expropiada en el Valle de Yabucoa, el cual no estaba zonificado, pero con una trayectoria indiscutible de uso agrícola. Tiempo después, en 2009, la Asamblea Legislativa decretó su protección para dicho uso. De otro lado, al tiempo de la petición de expropiación en 2004, ya existía legislación para proteger el Valle del Coloso como un recurso agrícola. Ante este contraste, la Autoridad de Tierras pretende impugnar el valor conferido por el TPI de $4,000.00 por cuerda de la finca Coloso, bajo el argumento de la ausencia de zonificación de la finca de Yabucoa.

Sin embargo, a base de la prueba presentada, no nos persuade otorgar un peso mayor a la condición de no zonificación del Valle de Yabucoa para justificar un valor menor a la finca Coloso. Primero, la señora Muñoz Guardiola no brindó en su testimonio ni

---

[21] Véase, TPO, págs. 85-86.
[22] TPO, pág. 115 líneas 1-11.

en su escrito un análisis explicativo del ajuste por el asunto de la zonificación. Por el contrario, su testimonio refrendó sin ambages el análisis del ingeniero Pons Mier, quien claramente minimizó la falta de zonificación del Valle de Yabucoa.[23] Segundo, del expediente se puede constatar que ambas propiedades, Yabucoa y Coloso, comparten características y condiciones similares de más envergadura, tales como la topografía llana, la configuración irregular, el historial de uso agrícola, la presencia de ríos y el porcentaje de inundabilidad de un 60%.[24] Tercero, independientemente de que no estuviera catalogado por una zonificación, ello no implicaba la posibilidad de cualquier desarrollo imaginable del Valle de Yabucoa distinto al uso agrícola. Esto se corrobora, precisamente, con la legislación ya citada posterior a su adquisición. Concluimos, pues, que la apelante falló en controvertir con suficiencia la determinación de hechos 62 del TPI, acerca de la improcedencia de realizar un ajuste por zonificación. No intervendremos con la deferencia judicial, por lo que el error no fue cometido.

**(ii)**

En el segundo señalamiento de error, la Autoridad de Tierras aduce que el TPI se equivocó al conceder un ajuste desproporcional de más de 6% por la diferencia de tiempo entre la venta de la finca de Yabucoa, el 3 de julio de 2003 ($3,800.00 por cuerda), y la petición de expropiación forzosa de la finca Coloso, instada el 9 de

---

[23] Citamos la TPO, pág. 98 líneas 10-20, en particular, la opinión de la señora Muñoz Guardiola sobre el *Informe de Valoración* realizado por el ingeniero Pons Mier:

P. Testigo, ¿usted tuvo oportunidad de ver el informe que preparó el perito de la parte con interés?
R. Sí.
P. ¿Como profesional de la valoración, qué comentarios le merece que usted quisiera llevar al Tribunal con relación a lo que vio en esa evaluación de esos, de ese informe?
R. No tengo objeción ninguna a ese informe.
P. ¿No tiene ninguna objeción al informe de la parte con interés?
R. No, no tengo ninguna.

[24] Véase, Apéndice del recurso, pág. 210.

julio de 2004, a la que el TPI confirió una justa compensación de $4,000.00 por cuerda.

Consignó el TPI en la determinación de hechos 64: "El único **ajuste cuantitativo** que procede realizar a la venta 3 es el de **tiempo o condiciones de mercado** por **$249.00 por cuerda**, por el **año de diferencia** entre esta venta y la fecha a la que se tasó el sujeto. Esta cantidad proviene del **6.56% anual**, computado utilizando el método de venta pareada desarrollado con la reventa de la venta 2".[25] (Énfasis nuestro). Sobre este particular, los peritos declararon lo siguiente:

### Ing. Pedro Pons Mier

De acuerdo con la opinión del perito Pons Mier, la finca de Yabucoa es la más similar a la del caso de marras en todas sus condiciones.[26] Para valorizar, **el experto utilizó la regla de una sola unidad o *unit rule*.**[27] Al referirse al *unit rule* el ingeniero Pons Mier destacó que, **a base del precio unitario, el comprador paga un monto global por la finca**. Es decir, no particulariza el valor de las partes que sean humedales, o áreas sembradas, o las que no es posible desarrollar, sino que **el precio comprende todas las partes de la finca**.[28] Al partir de ese enfoque, discutió las comparables de la finca Coloso, las cuales, fueron básicamente las mismas que las utilizadas por la señora Muñoz Guardiola.[29] El perito Pons Mier explicó, además:

> R. Bueno, la tasación de una parcela vacante o agrícola como esta, digo "vacante" en el sentido de que no tiene estructura, es, se hace de distintas formas, ¿verdad? Se puede hacer a base de ventas comparables, se puede hacer a base de rentas de la finca, capitalizando las rentas, pero en este caso, en Puerto Rico no se alquilan

---

[25] Véase, además, Apéndice del recurso, pág. 210.
[26] TPO, pág. 52 líneas 1-2.
[27] La regla de una sola unidad o *unit rule* "prohibits valuations where the individual lots or units are given a value and then, in order to determine the value of the entire property, the values of the individual lots/units are simply added together". TPO, pág. 129 líneas 20-24, en referencia a *Lehigh-Northampton Airport Authority v. Fuller*, 862 A.2d 159, 165 (2004).
[28] TPO, págs. 36 líneas 18-25; 37 líneas 1-7.
[29] TPO, pág. 37 líneas 7-9.

las fincas con el propósito de venderlas ni nada, o sea, ni se compran ni se venden por su, su potencial de ingresos.

En Puerto Rico se venden y se compran las fincas por su potencial agrícola, y estamos hablando nada más que de fincas agrícolas. Entonces, en este caso, pues viene la importancia de las ventas comparables que sean agrícolas y cómo se analizan.

Y entonces, **el tasador coge cada una de esas ventas y las analiza y cualquier diferencia que tengan con el sujeto, extrae del mercado los ajustes necesarios para llevar la comparable a una condición similar al sujeto**.

P. ¿Qué usted quiere decir que "extrae del mercado"? ¿Podría usted abundar sobre la materia?

R. Bueno, primero que nada **es importante tener en claro que una finca se tasa como una, bajo el *unit rule* que es la regla federal para todas las fincas agrícolas también**.

P. ¿Cómo qué?

R. El *unit rule*, **se tasa como un solo ente, o sea, no se tasa en pedazos para sumar después los pedazos**. Digamos, toda la finca se analiza como un solo, una sola finca. Entonces, se trae la comparable. Si la comparable, digamos, es superior en, en algún criterio que el tasador le encuentre...

P. Perdóname un momentito, don Pedro. ¿Qué usted quiere decir con "venta comparable", una comparable?

R. **Una venta comparable es una venta de otra finca que sea lo más similar posible al sujeto en cabida, en, sobre todo, en su mejor uso, que sea agrícola**.

P. Okey. Continúe, por favor.

R. Entonces, el tasador identifica qué factores pueden ser distintos en esa, digamos pues si hay una fecha de venta que es anterior al sujeto, pues entonces, el tasador determina, que es el ajuste de tiempo y se conoce como el "ajuste de condiciones de mercado", pero **los ajustes hay que extraerlos del mercado**. La mejor forma de conseguir ese ajuste es coger una propiedad que se vende en una fecha, que no tenga cambio, y se revenda en otra fecha y a base de su cambio en valor a través del tiempo, se determina el aumento que hay en esa propiedad. Similarmente cualquier otra, otro factor que se encuentre, si hay, si el tasador determina que hay una diferencia en valor o en la cabida, pues tiene que mostrar dos fincas que sean exactamente iguales en todas las demás condiciones, menos en cabida y que haya una diferencia en unitario, porque ese, esa cabida afectó el unitario. Pero todo se extrae de las ventas del mercado, no

tenemos, desgraciadamente, un libro ni tablas que nos digan cuánto son cada factor.[30] (Énfasis nuestro).

El ingeniero Pons Mier indicó que la teoría de la tasación divide los ajustes de tiempo en cuantitativos y cualitativos.[31] Él utiliza los cuantitativos.[32] Finalmente, tal como consignó el TPI, el ingeniero Pons Mier recomendó **un valor ajustado de $4,049.00**; es decir, **$249.00 adicionales** a los $3,800.00 por cuerda, en comparación con lo pagado por la finca de Yabucoa.[33]

> R. [...] El informe de la señora Muñoz dice que la finca es superior en zonificación, pero al momento de su venta, esta finca no estaba zonificada, pero su uso era, mejor uso, era agrícola y nadie consideró tener otro uso para ella.
>
> De hecho, la Autoridad de Tierras la adquiere y pocos años después, en el 2009, establece la Reserva Agrícola del Valle allí, de Yabucoa. O sea, que es, y sus zonificaciones como reservas son casi idénticas a las del sujeto.
>
> O sea, que cuando yo llego a la página de ajustes para esta finca, si vamos a la página 35 de nuevo, la finca se vende en 18 millones ochocientos y querían hacer un unitario de $3,800 por cuerda.
>
> **No hay que hacerle ningún ajuste cuantitativo, nada más el de las condiciones de mercado, para traerlo a la fecha de venta, es un ajuste pequeño de un año que aumentó el valor, aumentó $249 por cuerda en ese año.**
>
> **El valor indicado es $4,049 por cuerda.** En todos los ajustes cualitativo es similar al sujeto. Quisiéramos los tasadores muchas veces encontrar comparables que sean tan similares como esta. Su valor indicado final es 4,049 por cuerda.[34] (Énfasis nuestro).
>
> .     .     .     .     .     .     .     .
>
> P. Si usted entiende, su informe concluye que dentro de esta regla el Estado debe pagar al mismo unitario los terrenos humedales, los terrenos inundables dentro del sujeto, que si esa es su conclusión a raíz de este informe, eso es lo que yo quiero que esté para récord.
>
> R. Déjeme explicar un poquito. Yo no estoy tasando un valor para que el Estado pague. Yo estoy dando un valor en el mercado, de una finca. Yo no estoy cuestionando cuánto debe ser un pago del Estado, en absoluto.
>
> Lo que sí le digo es que el valor unitario se aplica completo a la finca, igual que los $4,000, los 3,800 estos, dólares, que se pagaron por, por la finca de Yabucoa, esos $3,800 aplicaron a toda la finca, las partes inundables, partes de río.

---

[30] TPO, págs. 29 línea 25; 30-31; 32 líneas 1-6.
[31] TPO, pág. 32 líneas 19-20.
[32] TPO, pág. 33 líneas 5-6.
[33] Apéndice del recurso, pág. 210.
[34] TPO, pág. 52 líneas 2-24.

> Ahí había carreteras que no se segregaron, se pagó por esas carreteras, se pagó por dos cauces del río que cruzan la finca, todo se pagó a $3,800. Yo lo que estoy es aplicando la misma regla. Y en cada una de las comparables se paga lo mismo por todos los terrenos, por todas las variaciones.
>
> O sea, **no se tasa por secciones, se tasa como un todo**. Ahora, si tiene un factor adicional que hay que ajustar, **se ajusta, pero se paga por un todo**.[35] (Énfasis nuestro).

### *Sra. Agnes Muñoz Guardiola*

Por su parte, la señora Muñoz Guardiola planteó la valorización a base de cuatro porciones de la finca Coloso: agrícola en reserva; conservación de recursos, desarrollo selectivo y áreas desarrolladas.[36] Una vez valorizadas de forma individual, sumó los subtotales para obtener un total final. Evidentemente, **la metodología contravino la regla de una sola unidad**. Ello así, <u>aun cuando éste fue el enfoque de valoración que la propia apelante determinó que utilizaría</u>.[37]

> P. Esto está tomando el sujeto como predios independientes y les está asignando valores individuales para luego sumarlos y emitir su opinión, ¿correcto?
>
> R. Correcto.
>
> P. **Y eso en ese momento está en conflicto con la regla del *unit rule*, ¿correcto?**
>
> R. **Correcto**.[38] (Énfasis nuestro).

En cuanto a las categorías, en la adenda de 6 de agosto de 2021 se eliminaron las últimas dos secciones.[39]

> P. Usted ha declarado ahorita que la había dividido en cuatro porciones; desarrollo selectivo, conservación de recursos, agrícola RI y R2, hace cuatro subdivisiones. Sin embargo, en su informe solamente pone 210 cuerdas en humedales, conservación de recursos, y el resto del sujeto en AR, zonificación agrícola, ¿correcto? Así que en su informe…
>
> .    .    .    .    .    .    .    .
>
> R. Correcto.
>
> .    .    .    .    .    .    .    .

---

[35] TPO, págs. 71 líneas; 19-25; 72 líneas 1-18.
[36] Apéndice del recurso, págs. 135-170.
[37] Refiérase al Apéndice de la parte apelada, págs. 190-192.
[38] TPO, pág. 117 líneas 17-23.
[39] Apéndice del recurso, págs. 169-170.

P. En su informe, **usted establece cuando menos dos categorías distintas, ¿verdad que sí?**

R. **Cor[r]ecto**.[40] (Énfasis nuestro).

.      .      .      .      .      .      .      .      .

P. Bien. Pasemos al último *addendum*, al Informe de Valoración del 6 de agosto de 2021. Al dorso de ese documento, doña Agnes, usted sigue asignando porción uno 2,080.4117 cuerdas y 234.0309 cuerdas, ¿correcto?

R. Correcto.

P. O sea, que el 6 de agosto de 2021 **usted continuó utilizando una aplicación de la regla, violando la regla del *unit rule*** en la tasación de ese, del sujeto, ¿correcto?

R. **Correcto**.

P. O sea, ¿en el dos mil vein... para el 2021 usted había tenido la oportunidad de examinar el *Informe de Valoración* del señor Pons? Y usted pudo comprobar en el informe del señor Pons si él discutía del aspecto del *unit rule*, ¿pudo examinarlo, doña Agnes?

R. Sí.

P. Y aún así, el 6 de agosto usted hace un *addendum* al informe y continúa segmentando o dividiendo la propiedad en porciones, en porción uno y porción dos, ¿correcto?

R. Correcto.[41] (Énfasis nuestro).

Acerca del *Informe de Valorización* que suscribió, la perita

declaró:

R. Realicé una valoración de un predio de 2,359.01015 cuerdas, de las cuales había parte de que hay una porción que es reserva en agrícola, I y II, hay otra porción que es conservación de recursos y había otra porción que era desarrollo selectivo y área desarrollada. Cada una son por, se valoraron en porciones diferentes por el, porque la zonificación que había tenía un uso en específico. Las porciones que estaban en la, de desarrollo selectivo y área desarrollada eran colindantes a la carretera 111 que transcurre de Aguada hacia, hacia Moca.
La conser... el área de conservación de recursos queda dentro del área de, de agrícola, de la reserva agrícola, lo único es que el uso que se le daba no se podía utilizar agrícolamente y la porción de reserva en agrícola, agrícola en reserva I y II, pues se hace una valoración completa, como si fuese una única unidad. **Ahí se**

---

[40] TPO, pág. 116 líneas 5-21.
[41] TPO, págs. 128 líneas 9-25; 129 líneas 1-4.

> **determinó, cada uno determiné un valor diferente a su uso para ese entonces**.
>
> P. ¿En ese entonces, en el 2004, esa era la práctica?
>
> R. **Esa era la práctica**.
>
> P. Le pregunto yo, ¿cuando usted oyó en la mañana de hoy al perito de la parte con interés, que inclusive, en su informe hace mención, el *unit rule* o regla de la unidad, es el estándar hoy día y menciona en su propio informe que el *unit rule appraisal standard* del *federal land acquisition* del 2016, él lo aplica, o se aplica este tipo de tasación, al día de hoy eso sería correcto?
>
> R. **Sí, él estaba correcto e inclusive yo estoy en lo correcto, porque yo taso, él tasa su, su, la unidad agrícola como una sola**. Lo que yo hice fue tasar la unidad agrícola como una sola. Lo único es que en el mapa donde, me entregan, cuando me entregan el plano de mensura, había porciones que estaban, que no iban acorde con la, con la zonificación que existía de la unidad completa, que era las, las reser... agrícola en reserva I y II. Porque **no es lo mismo agrícola en reserva I y II que desarrollo selectivo**, hay una porción con frente a Carretera 111, con varios usos a sus colindantes, no es lo mismo un desarrollo a, de uso a ser residencial, comercial, lo que sea, a uno agrícola, independientemente que sea parte de la finca.[42]

La perita de la Autoridad de Tierras fraccionó la finca Coloso, a pesar de que el valor de las comparables, de igual uso agrícola, fue estimado a base del *unit rule*.[43] A base de dicho análisis, la señora Muñoz Guardiola estimó el **valor en $2,500.00 por cada cuerda de la finca Coloso**.[44] Esto es, $1,300.00 menos que lo pagado un año antes por cada cuerda de la finca de Yabucoa, con la cual guardaba una sustancial similitud. Sin embargo, de acuerdo con la tendencia en el mercado, la señora Muñoz Guardiola sí coincidió que el valor de $3,800.00 por cuerda de la comparable requería un ajuste por tiempo.

> P. Así que estaría entonces usted de acuerdo conmigo, que de acuerdo a la tendencia del mercado, en el 2004 esa finca debía, o procedería o cabría, hacerle un ajuste por tiempo, ¿correcto?
>
> R. Se podría.[45]

---

[42] TPO, págs. 88 líneas 12-25; 89; 90 líneas 1-4.
[43] TPO, pág. 115 líneas 16-21.
[44] TPO, pág. 95 líneas 9-13.
[45] TPO, pág. 114 líneas 18-22.

Con relación al enfoque de valorización mediante la segmentación, pero utilizar comparables valoradas a base del *unit rule*, el ingeniero Pons Mier afirmó que "[...] el efecto que tiene en la valorización es que tenemos que comparar chinas con chinas y botellas con botellas, porque si las comparables tenemos que se busca un valor unitario incluyendo todas las secciones, humedales, secciones buenas para sembrar, secciones que son inferiores, pues tenemos un valor unitario que cubre todos esos aspectos".[46] Agregó que, **al no utilizar el *unit rule* y aplicar distintos valores a las secciones, se produjo una reducción del valor de la propiedad**.[47]

Como cuestión de umbral, destacamos que el enfoque de valorización utilizado por la señora Muñoz Guardiola contravino sus propios términos como funcionaria de la agencia y, evidentemente, tuvo el efecto de disminuir el valor unitario de la finca Coloso. En el presente caso, no está en controversia la aplicación de la regla de una sola unidad o *unit rule*. Así surge de las palabras de la jueza, Honorable María Díaz Pagán: "De hecho, eso fue, un memorando de derecho de la parte peticionaria, donde se indicó que se iba a usar el *unit rule*. [...] Estoy clara que fue la propia peticionaria quien estableció que aquí se iba a utilizar el *unit rule*, eso fue lo que yo leí del expediente".[48] Ciertamente, esta inconsistencia en la prueba de la apelante nos parece razón suficiente para que el TPI no le reconociera credibilidad y descartara sus conclusiones. Esta evidencia contrastó con el análisis detallado que vertió el perito Pons Mier en su testimonio y el *Informe de Valoración* sometido.

Asimismo, según mencionamos, la perita de la Autoridad de Tierras estuvo de acuerdo con la postura del ingeniero Pons Mier, en que la cifra en la venta número tres requería un ajuste por tiempo

---

[46] TPO, págs. 54 líneas 20-25; 55 línea 1.
[47] TPO, pág. 55 líneas 10-25.
[48] TPO, págs. 70 líneas 15-22; 71 líneas 8-10.

a favor del predio aquí expropiado. Por igual, la perita Muñoz Guardiola concurrió en que el uso más provechoso para la finca de este caso, al igual que el mejor uso de la comparable, era el agrícola.[49] Decididamente, un examen ponderado de la prueba revela que las recomendaciones que incluyó el ingeniero Pons Mier estuvieron bien fundamentadas. Ante ello, concluimos que actuó correctamente el TPI al acogerlas y aplicar el método de valoración que éste utilizó para estimar la justa compensación.

Ahora, distinto a lo alegado por la Autoridad de Tierras, o incluso lo consignado en la determinación de hechos 64 antes citada, el TPI no ajustó el valor en más de 6% ($249.00), sino en un 5% ($200.00).[50] Por lo tanto, ante la ausencia de fundamentos en Derecho adecuados,[51] decidimos no intervenir con la sapiencia del TPI y colegimos que no se cometió el error imputado.

**IV.**

Por los fundamentos expuestos, confirmamos la *Sentencia* apelada.

Lo acordó el Tribunal, y lo certifica la secretaria del Tribunal de Apelaciones. La Jueza Álvarez Esnard concurre sin voto escrito.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[49] TPO, pág. 130 líneas 7-20.

[50] Por ciento de incremento del precio = 100 (final – inicial)/inicial; 100 (4,000 – 3,800)/3,800; 100 (200)/3,800; 100 (.05). El por ciento de incremento del precio = 5%.

[51] La apelante arguye razones ajenas a la prueba testifical y pericial que el TPI justipreció. Por ejemplo, los efectos del acto de terrorismo en Nueva York el 11 de septiembre de 2001, el cierre de manufacturas amparadas por la Sección 936 del Código de Rentas Internas y la petición de quiebra del Gobierno en 2017 por virtud de la Ley PROMESA.